Filed 4/8/22  P. v. Loza CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B310731 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA068327) |
| v. | |
| GILBERT RAYMOND LOZA et al., | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of Los Angeles County, Lee W. Tsao, Judge.  Affirmed.

Richard B. Lennon and David Andreasen, under appointment by the Court of Appeal, for Defendant and Appellant Gilbert Raymond Loza.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant Jaime Jauregui.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Daniel Chang and Colleen M. Tiedemann, Deputy Attorneys General, for Plaintiff and Respondent.

Gilbert Raymond Loza and Jaime Jauregui (defendants) appeal from orders of the superior court denying their petitions to vacate their felony-murder convictions after an evidentiary hearing. Defendants argue that the record does not support the superior court's finding that they were major participants in the crime and acted with reckless indifference to human life. We disagree with defendants' arguments and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

### A. *The crimes committed in 2001*

On June 20, 2001, Loza and Jauregui were together with two other individuals, Claudia Valencia and Primitivo Macias, at Macias's home. At Valencia's suggestion, this group decided to rob an auto parts store. When they left Macias's home, Loza took a black revolver, Jauregui took a silver revolver, and Macias took an "Uzi-type" gun. Valencia drove the men to the auto parts store, removing the license plates before driving there.

At the auto parts store, the three men (Loza, Jauregui, and Macias) took their guns and went to the store's front door, which was locked. After trying to unlock the door, they returned to the car.

Valencia then drove them to a liquor store which was about three and a half miles away and parked in front. Loza, Jauregui, and Macias went into the liquor store, each carrying his gun. Within five minutes, Valencia heard a gunshot. Loza, Jauregui, and Macias then ran out of the store and got into the car. Jauregui had taken a case of beer from the liquor store. The

---

[1] We previously granted Loza and Jauregui's request to take judicial notice of the record in their direct appeal, including our unpublished opinion. (Evid. Code, §§ 451-453.)

2

three men were still carrying their guns when they emerged from the store.

Inside the store, the cash register had been tipped over and the store clerk, Saiyad Haque, had been shot. Haque died from gunshot wounds to his head and abdomen. Defendants assert, and the People do not contest, that Macias—not Loza or Jauregui—was the shooter.

After the group left the liquor store, Jauregui suggested they rob a beauty salon. On the way to the beauty salon, Loza bought three bandannas to use as masks. Valencia then drove the group to a hair salon which was a few minutes away. The men covered their faces with the bandannas, took their guns, and went into the salon. They ordered everyone to lie down on the floor and demanded money and valuables. Seven people in the salon were robbed of various items.

When they came out of the building, Jauregui was carrying a black purse. Valencia drove the group to a friend's house where they divided the money.

About 40 minutes elapsed from the attempted robbery at the auto parts store to the robberies at the salon (a period of time that included the shooting of Haque at the liquor store).

Nine days later, on the evening of June 29, 2001, Loza and Jauregui, wearing bandannas, approached Victor Sanchez. Loza pointed a gun at Sanchez's head and shoved Sanchez to the hood of a car as Jauregui took Sanchez's wallet. Although the wallet was subsequently returned to Sanchez, $180 was missing.

Two days after that, on July 1, 2001, Loza and another masked man approached two cousins in a parked car. Loza and this other man, who had his hand under his sweater as if holding a gun, took the cousins' car and a necklace.

**B.** *Loza and Jauregui's convictions in 2003*

The People tried Loza and Jauregui on a theory of felony murder. The jury convicted both Loza and Jauregui of one count of first degree murder. (Pen. Code,[2] § 187, subd. (a).) The jury also convicted Loza and Jauregui of numerous other counts relating to the commission of the robberies and carjacking. On July 18, 2003, the trial court sentenced Loza to 38 years to life in prison and sentenced Jauregui to 35 years to life in prison. This court affirmed the judgment. (*People v. Jauregui and Loza* (July 23, 2004, B168925) [nonpub. opn].)

**C.** *Loza and Jauregui's petitions for resentencing*

On January 4, 2019, Loza filed a petition for resentencing under section 1170.95. On January 17, 2019, Jauregui filed his petition for resentencing under the same statute. Both Loza and Jauregui asserted that they were found guilty of first degree murder under a theory of felony murder, they were not the actual killer, and they did not meet the current legal requirements for felony murder. The superior court found that Loza and Jauregui made a prima facie case, appointed counsel, and set an evidentiary hearing.

At the evidentiary hearing, the superior court took judicial notice of the court file of the underlying conviction, which included the Court of Appeal decision, the information, the jury instructions, and the sentencing transcript. No party sought to introduce additional evidence.

After hearing argument from counsel for the parties, the superior court denied Loza and Jauregui's petitions. The court

---

[2] All further undesignated statutory references are to the Penal Code.

4

explained its view of the evidence and found that Loza and Jauregui aided and abetted robbery, that they intended to aid and abet Macias in committing the robbery, that Macias killed Haque while committing the robbery, that defendants were major participants in the robbery, and that when defendants participated in the robbery, they acted with reckless indifference to human life. Defendants timely appealed.

## DISCUSSION

## I. The law of murder and Senate Bill No. 1437

Murder is "the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Malice may be express or implied. (§ 188.) Although malice is an element of murder, when Loza and Jauregui were convicted, the law allowed defendants who did not act with malice to be liable for murder under certain circumstances.

Loza and Jauregui were convicted under the felony-murder doctrine in accordance with section 189. Under prior California law, every accomplice to an enumerated felony could be convicted of first degree murder if a death occurred during the commission of that felony—regardless of whether the accused killed or intended to kill. (See *People v. Dillon* (1983) 34 Cal.3d 441, 462–472.)

The Legislature enacted Senate Bill No. 1437 to "amend the felony murder rule . . . as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); see *People v. Lewis* (2021) 11 Cal.5th 952, 959.) It accomplished this by amending section 189 " 'to restrict the scope of first degree

felony murder.' " (*People v. Eynon* (2021) 68 Cal.App.5th 967, 973.)

"Amended section 189 limits the first degree felony-murder rule by imposing new requirements for its application. The statute provides that, unless the victim is a peace officer killed in the line of duty, a defendant cannot be liable for first degree felony murder unless the defendant was the actual killer, acted with intent to kill, or was a major participant in the underlying felony and acted with reckless indifference to human life." (*People v. Eynon*, *supra*, 68 Cal.App.5th at p. 974.)

**II.    Section 1170.95**

In addition to changing the law of murder prospectively, Senate Bill No. 1437 gave people who had been convicted under the now-invalid theory of felony murder the opportunity to petition for resentencing under newly-enacted section 1170.95. (Stats. 2018, ch. 1015, § 4.) Section 1170.95, subdivision (a) describes who may petition for resentencing under the statute. Subdivision (b) explains what information the petition must contain, where the petitioner must file it, who the petitioner must serve, and what the court should do if it is incomplete. Subdivision (c) describes the process the court uses to determine whether the petitioner is entitled to an evidentiary hearing. (*People v. Lewis*, *supra*, 11 Cal.5th at p. 962.)

As is relevant here, the statute provides the following with respect to the evidentiary hearing: "At the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019. The admission of evidence in the

6

hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed." (§ 1170.95, subd. (d)(3).)

## III. The substantial evidence standard of review applies to this appeal

We review for substantial evidence the superior court's determinations at the section 1170.95, subdivision (d)(3) evidentiary hearing. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298; *People v. Garrison* (2021) 73 Cal.App.5th 735, 747.) At the evidentiary hearing, the superior court acts as finder of fact to determine whether the prosecution has proved beyond a reasonable doubt that a defendant is guilty of murder consistent with current law. (§ 1170.95, subd. (d)(3).) Here, for example, the People had the burden to prove to the superior court beyond a reasonable doubt that Loza and Jauregui were major participants in the underlying felony and acted with reckless indifference to human life. (§ 189, subd. (e)(3).)

We review a trial judge's fact findings for substantial evidence. (*People v. Gregerson* (2011) 202 Cal.App.4th 306, 320.) We " 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' " (*People v. San Nicolas* (2004) 34 Cal.4th 614, 657–658.) Our job on review is different from the superior court's job in deciding the petition. While the superior court judge must review all the relevant evidence, evaluate and resolve contradictions, and make

7

determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt. (See *ibid.*)

We are aware of no appellate court that has applied a standard other than substantial evidence in reviewing a denial of a section 1170.95 petition after an evidentiary hearing. Moreover, defendants do not appear to disagree with the proposition that the substantial evidence standard generally applies. Defendants argue, however, that where (as permitted by statute) all parties and the superior court rely on the evidence from the prior conviction, and neither party calls new witnesses, the standard on review should be de novo on the theory that the appellate court, like the superior court, can review the same record and make its own determinations. We do not agree.

Defendants rely on *People v. Vivar* (2021) 11 Cal.5th 510, which held at pages 525 to 526 that the standard of review for a denial of a motion under section 1473.7 was not the deferential abuse of discretion standard, but rather an independent review of the record. *Vivar*'s analysis and the statutory scheme it was applying were far afield from the situation presented here. Section 1473.7, subdivision (a)(1), allows a motion to vacate a conviction on the grounds that there was prejudicial error damaging the moving party's ability to understand the actual or potential adverse immigration consequences of a criminal conviction. In *Vivar*, the court adopted a less deferential standard of review primarily because it considered the questions at issue there "predominantly questions of law" which should be reviewed independently. (*Vivar*, at p. 524.) The court in *Vivar*

noted that nothing in section 1473.7 gave rise to any "reason to deviate from the template." (*Vivar*, at p. 525.) While our Supreme Court did mention the "cold record" that the trial court reviews in connection with a section 1473.7 motion as further support for its decision (*Vivar*, at pp. 526–527), that was not the primary reason for its holding.

Defendants' reliance on *People v. Duff* (2014) 58 Cal.4th 527 is also unavailing. *Duff*, at page 551, held that, in the context of a *Miranda*[3] rights violation, the appellate court defers to the trial court when it decides disputed facts and inferences, but independently determines from the undisputed facts, such as a videotaped confession, whether the challenged statement was illegally obtained. This holding about how to determine whether a confession was illegally obtained, which is not solely a factual question, does not create a general rule of review where a trial court decides disputed factual issues on a written record.

Nowhere in either case cited by defendants did the Supreme Court announce a new rule that evidentiary hearings in which the parties stipulate to proceeding on a written record receive a less deferential standard of review. Such a rule would allow the parties to manipulate the standard of review (and obtain a second chance for de novo determination) by choosing not to introduce new evidence. Indeed, the recent case of *People v. Clements, supra*, 75 Cal.App.5th at page 298, applied a substantial evidence standard of review even though the parties, like the parties here, agreed not to introduce live testimony at the evidentiary hearing.

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

Here, the superior court acted as a trier of fact.  It decided contested factual issues.  Defendants and the People had the opportunity to put on live testimony but chose not to.  The superior court was required to, and did, make factual findings.  Those findings on a disputed factual issue are subject to the traditional substantial evidence standard of review.

## IV.  Substantial evidence supports the superior court's findings

In *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), the court described a number of factors that may be considered to determine whether a defendant is a major participant in the felony who acts with reckless indifference to life.  *Banks*, at pages 804 to 807, applied these factors in the context of determining that the getaway driver in that case was not a major participant in the crime.

The factors discussed by *Banks*, *supra*, 61 Cal.4th at page 803 include:  "What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inactions play a particular role in the death?  What did the defendant do after lethal force was used?" (Fn. omitted.)

In *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), our Supreme Court turned more specifically to factors that are relevant to a finding of reckless disregard for human life.  *Clark*, like *Banks*, discussed various factors:  "Did the defendant use or know that a gun would be used during the felony?  How many

10

weapons were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins* (2020) 9 Cal.5th 667, 677 [listing factors set forth in *Clark*, at pp. 618–623].)  The *Clark* factors overlap significantly with the factors in *Banks*.

A. ***Loza and Jauregui were major participants in the robbery***

Here, Loza and Jauregui had far more involvement in the robbery than the getaway driver in *Banks*.  From the start, Loza and Jauregui were part of the planning of the robbery at Macias's house.  They agreed with Valencia's suggestion to rob an auto parts store.  Loza and Jauregui left Macias's house armed.  Their confederate Macias was openly carrying an "Uzi-type of a gun," a particularly violent assault weapon.

Loza and Jauregui were present for all parts of the robbery. After being unable to rob the auto parts store because its doors were locked, Loza and Jauregui accompanied Macias to the liquor store.  While Valencia parked in front of the liquor store and remained in the car, Loza and Jauregui went inside the store with their guns, accompanying Macias, who they knew was also armed with a gun.  After Haque was shot, Loza and Jauregui came out of the store with Macias and Valencia drove them away. Jauregui carried a case of beer from the store.

Loza and Jauregui continued from the liquor store to another establishment, a beauty salon.  It was Jauregui's idea to

rob the salon. Loza purchased bandannas that would be used as a disguise. At the beauty salon, the three armed men, including Loza and Jauregui, masked and brandishing their weapons, ordered the patrons onto the floor and robbed them. Afterwards the four of them divided the money from the crime.

In short, Loza and Jauregui were involved in every aspect of the felony: from the planning to their presence at the robbery that led to Haque's death, to their subsequent continuation of their robbery spree, to their division of the monies. (See, e.g., *In re Parrish* (2020) 58 Cal.App.5th 539, 543 [defendant who participated in each stage of robbery was major participant].) Substantial evidence supports the superior court's finding that they were major participants in the crime.

### B. *Loza and Jauregui acted with reckless indifference to human life*

A finding that Loza and Jauregui were major participants in the crime is not sufficient to find that Loza and Jauregui acted with reckless indifference for human life. The cases recognize, however, that there is an interrelationship and overlap between the two inquiries. (*Clark, supra,* 63 Cal.4th at pp. 614–615; *People v. Medina* (2016) 245 Cal.App.4th 778, 788.) "[F]actors demonstrating petitioner's role as a major participant are highly relevant to the analysis of whether he acted with reckless indifference." (*In re Loza* (2017) 10 Cal.App.5th 38, 52.) "Generally, the greater the defendant's participation in the felony murder, the more likely he or she acted with reckless indifference to human life." (*People v. Garcia* (2020) 46 Cal.App.5th 123, 147.)

Loza and Jauregui argue that the record does not support a finding that they acted with reckless indifference to human life.

Accordingly, we consider the circumstances of the crime, including the *Banks* and *Clark* factors.

There was significant evidence that Loza and Jauregui were involved in planning the crime. They were there at the inception, planning to rob the auto parts store along with Valencia and Macias. When that was not possible, Loza and Jauregui were present when the parties determined to go to the liquor store instead. Valencia drove them "to pull another robbery because that one was failed." After the shooting at the liquor store, Jauregui chose the next target and Loza supplied the others with bandannas as masks. They shared equally in the cash obtained from their robberies.

We next consider the factor, "What role did the defendant have in supplying or using lethal weapons?" (*Banks, supra,* 61 Cal.4th at p. 803; see *In re Scoggins, supra,* 9 Cal.5th at p. 677 [describing *Clark* factor].) Not only did Loza and Jauregui know their confederate was using an Uzi-type gun, but they were themselves armed during the robbery that led to Haque's death. Their personal use of guns in a robbery at a commercial establishment supports a finding of reckless indifference to human life.

Next, what awareness did defendants have "of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?" (*Banks, supra,* 61 Cal.4th at p. 803.) Defendants correctly argue that the record does not contain evidence they knew of Macias's past conduct or proclivity for violence. However, both defendants had knowledge of the dangers posed by the nature of the crime and the weapons used. They entered a store with Macias carrying an Uzi-type weapon, i.e., a submachine gun. Valencia identified Macias's gun

13

as an assault weapon.  Moreover, Loza and Jauregui were aware of the nature of the crime:  an armed robbery in broad daylight in a commercial liquor store at which people were likely to be present.  This was not a time of day that would lessen the risk of death.  (See *Clark*, *supra*, 63 Cal.4th at pp. 621–622 [robbery after hours when no one is present minimizes risk of harm to human life].)

An important factor relates to defendants' presence at the scene of Haque's murder.  "Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inactions play a particular role in the death?"  (*Banks*, *supra*, 61 Cal.4th at p. 803.)  Defendants' presence at the crime scene—while wielding guns during the shooting of Haque—weighs in favor of a finding that they acted with reckless indifference to human life.  "Presence at the scene of the murder is a particularly important aspect of the reckless indifference inquiry."  (*People v. Garcia*, *supra*, 46 Cal.App.5th at p. 148.)  As one appellate court noted:  "we are not aware of a single case that concludes a defendant who personally committed a robbery, used a gun, and was present for the shooting did not meet" the standards for special circumstances, including reckless indifference.  (*People v. Law* (2020) 48 Cal.App.5th 811, 825, review granted July 8, 2020, S262490.)  Similarly, neither Loza nor Jauregui have cited us to any case where a defendant who personally committed a robbery, was himself armed with a gun, and was present at the scene of the shooting was able to obtain the benefit of resentencing under section 1170.95.

Presence at the crime provides defendants with opportunities to restrain their cohorts and render aid to wounded

14

victims. (*Clark, supra,* 63 Cal.4th at p. 619.) Here, Loza and Jauregui did nothing to aid Haque after he was shot. Instead, they ran out of the store, leaving him alone, and proceeded to commit other crimes.

Defendants do not dispute that they were inside the store at the time of the shooting and ran away after Haque was shot. Defendants argue, however, that the store might have been too big to allow them to intervene. This argument is speculative. This was a neighborhood liquor store with only Haque inside. The superior court also saw photographs of the inside of the store. The superior court reasonably found that defendants failed to aid the victim based on defendants' presence in the store and their fleeing after the shooting.

Courts often consider the duration of the crime in determining whether a defendant exhibited reckless indifference to human life. (*In re Miller* (2017) 14 Cal.App.5th 960, 975.) "Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark, supra,* 63 Cal.4th at p. 620.) Here, Macias, Loza and Jauregui were in the store for only up to five minutes before the shooting, which is not an extended period and does not by itself militate in favor of a finding of reckless indifference. However, those five minutes involved the three armed men alone in a store with their victim, a situation that provided time enough for escalating violence. This is not a case where an initial interaction, in which no one had guns drawn, turned suddenly violent, as is sometimes the case in crimes of brief duration. (See, e.g., *In re Scoggins, supra,* 9 Cal.5th at pp. 672, 681 [incident involving shooter suddenly

15

pulling out gun lasted no more than five minutes].) Here, the entire five minutes involved the opportunity for violence, which neither Loza nor Jauregui prevented.

Finally: "What did the defendant do after lethal force was used?" (*Banks*, *supra*, 61 Cal.4th at p. 803.) Here, Loza and Jauregui not only fled and failed to summon aid for Haque but continued actively pursuing other crimes with Macias, now known to them to be a killer. Jauregui grabbed beer from the liquor store at the time he could have been helping the victim.[4] Just after the shooting, Jauregui suggested robbing a salon and Loza got the bandannas to allow them to do so. At the same time as Haque was lying shot in the liquor store, Loza and Jauregui were brandishing their guns at beauty salon patrons and ordering them down on the floor.[5] This conduct exhibits a reckless indifference to human life by Loza and Jauregui.

Jauregui also argues that his age at the time of the crime, 24 years old, tends to negate reckless indifference. He cites *In re Moore* (2021) 68 Cal.App.5th 434, in which the defendant was 16 years old. *Moore* involved different facts and a much younger defendant. Under the circumstances at issue here, Jauregui's age—24 years old—did not negate his reckless indifference to human life.

---

[4] Jauregui argues that the evidence is unclear and the person grabbing the beer could have been Loza. There was direct evidence that the person with the beer was Jauregui, and the superior court was entitled to credit that evidence.

[5] Loza and Jauregui also continued their violent crimes over the next few weeks.

16

Loza and Jauregui's conduct provided a firm basis for the superior court to find that defendants acted with reckless indifference to human life.  Substantial evidence supports the court's orders denying defendants' petitions.

## DISPOSITION

The orders are affirmed.

NOT TO BE PUBLISHED.

LIPNER, J.*

We concur:

EDMON, P. J.

LAVIN, J.

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.